IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JASON NEWMAN,

       Plaintiff,                No. 3:17-cv-1055-HZ

**OPINION AND ORDER**

    v.

LOWE'S HOME CENTERS, LLC,

       Defendant.

_____

**HERNANDEZ, J.**

      Plaintiff Jason Newman brings this employment discrimination action against Defendant Lowe's Home Centers, LLC.  Defendant terminated Plaintiff, an assistant store manager, after he turned off the store alarm and went into the parking lot to check on his personal vehicle. Plaintiff asserts two claims: (1) Defendant terminated him because he invoked the benefits of the worker's compensation system, violating Or. Rev. Stat. §659A.040; and (2) Defendant terminated him for reporting criminal activity in good faith, violating Or. Rev. Stat. §

659A.230(1).[1]

Defendant now moves summary judgment on both claims.  I grant the motion.

## BACKGROUND

### I.  Plaintiff's Employment with Defendant

In April 2015, Plaintiff started working as an assistant store manager at Defendant's Milwaukie store.  Totten Decl., Ex. 1, Pl. Dep. 19, ECF No. 22-1.  He had prior experience as an assistant store manager with Home Depot.  Pl. Dep. 70.

Plaintiff was an at-will employee.  Pl. Dep. 245 & Ex. 16.  Plaintiff was neither promoted nor demoted until his termination.  Pl. Dep. 21.  After about six months at the Milwaukie store, Plaintiff transferred to Defendant's Hillsboro store, which added several hours to his commute.  Pl. Dep. 20.  In about September 2015, Plaintiff sought a transfer to a store that was closer to his home.

In January 2016, Plaintiff became assistant store manager for the overnight shift at Defendant's Delta Park store in north Portland.  Plaintiff disliked the Delta Park job because working nights meant he missed seeing his children, and because he had "to deal with the homeless and theft."   Pl. Dep. 106.

Plaintiff supervised about twelve employees.  Pl. Dep. 78.  As the overnight assistant store manager, Plaintiff was responsible for opening and closing the store, conducting perimeter checks, and setting and turning off the alarm system.  Pl. Dep. 108.  (Turning on the alarm system is also referred to as "arming" it.)  Plaintiff  was also responsible for unloading and

---

[1] Plaintiff concedes that his wrongful discharge claim should be dismissed.  Pl. Mem. Opp'n 2, ECF No. 25.

storing freight, and ensuring that the store was ready to open.

Plaintiff was the highest ranking manager in the store during the overnight shift.  He usually arrived at the store by 8:00 p.m.  If the prior manager had left early, Plaintiff was responsible for supervising the "closing associates," including cashiers and department supervisors.  Pl. Dep. 77-78.  Plaintiff then supervised the night employees, who were also referred to as "night stocking associates."  Pl. Dep. 102.  Plaintiff usually worked until about 7:00 a.m.  Pl. Dep. 37.  If the opening manager was late, Plaintiff was responsible for the "opening associates."  Pl. Dep. 78.

Starting in spring 2016, Plaintiff's supervisor was Tyler Schaffer, the Delta Park store manager.  When Schaffer arrived at the store around 5:00 or 5:30 a.m., Plaintiff would report on events that occurred during the night shift.  Pl. Dep. 37.

## II. Security at the Delta Park Store

Defendant classifies its stores by security risk, with Risk Level 1 as the lowest risk and Risk Level 6 as the highest.  Patronaggio Decl. ¶ 4.  In 2016, Defendant classified the Delta Park store as Risk Level 5, and used extra security measures such as additional cameras.  Patronaggio Decl. ¶ 5.  Defendant's policy was to keep the store alarm armed and the doors locked between midnight and 5:00 a.m.  Hunt Decl., Ex. 5, at 22-23 (Defendant's Night Stocking Security Procedures).  During these hours, employees were prohibited from leaving the store for breaks unless they had "an emergency (ex: family or medical)."  *Id.*, at 22.  The assistant store manager "must turn off and reset the alarm system and provide an explanation to the alarm monitoring station operator."  *Id.*

The Delta Park store was not in "the greatest of neighborhoods."  Pl. Dep. 75.  Plaintiff

testified that homeless persons "were constantly walking around, digging through our trash cans." Pl. Dep. 75. Plaintiff considered the store parking lot to be unsafe at night, testifying that several car break-ins and car thefts occurred during the weeks before the November 2, 2016 incident that preceded Plaintiff's termination. Pl. Dep. 99-100.

Plaintiff testified that as the store's night manager, he had a "very serious responsibility" to ensure that employees were safe. Pl. Dep. 103; *id.* at 87 ("I wanted to make sure everybody was as safe as they could be."). Plaintiff testified that "there was a level of I'm responsible for all these people's lives and safety. Could they have a gun? Could they shoot me? I mean, there was always that in your head." Pl. Dep. 106; *id.* (Plaintiff testified that while he was working for Home Deport, an assistant manager was shot during a store robbery).

Plaintiff learned about security procedures at the Delta Park store from the store's loss prevention manager, M. Scott Rains. Pl. Dep. 113. He also received guidance on security from Rains's supervisor, area loss prevention manager Jeff Patronaggio. Pl's Dep. 236-37.

Defendant required Plaintiff to notify Rains or Schaffer whenever he unlocked the doors and disarmed the store alarm between midnight and 5:00 a.m. Pl. Dep. 115, 271. Plaintiff testified that arming or disarming the alarm "wasn't a simple enter a code, hit enter. The arming and de-arming the building could take up to a couple of minutes." Pl. Dep. 115. Plaintiff was the only person in the store who had the alarm code. Pl. Dep. 116.

Plaintiff found that Defendant's policy on keeping the store alarm armed between midnight and 5:00 a.m. posed "challenges" when vendors or employees wanted to enter or leave the building. Pl. Dep. 72-73. For example, trucks delivering merchandise would sometimes arrive at 2:00 or 3:00 a.m. *Id.* Plaintiff testified that he never discussed with Rains how

frequently the store alarms could be disarmed between midnight and 5:00 a.m., although Rains "might have mentioned that after so many of them, he would have to answer for why, so we wanted to try to minimize it." Pl. Dep. 74. Plaintiff estimated that while he was assistant store manager at Delta Park, he turned off the alarm between midnight and 5:00 a.m. more than ten times and fewer than fifty times. Pl. Dep. 183; Pl. Dep. 74 (Plaintiff guessed he turned off the alarm once or twice per week between midnight and 5:00 a.m., "sometimes more").

Plaintiff usually emailed Rains and Schaffer to notify them that he had disarmed the store alarm. For example, in an email dated June 17, 2016, Plaintiff wrote, "Last night I let the electrician out around 1am and accidentally set the alarm off. I reset the perimeter after he left. Dion worked until 4am and I let him out and reset the perimeter." Pl. Dep., Ex. 20.

Before the November 2, 2016 incident that preceded Plaintiff's termination, Defendant did not discipline Plaintiff for disarming the alarm system between midnight and 5:00 a.m. Rains found that Plaintiff's conduct did not merit discipline because it "fell within general exceptions which would be allowed." Rains Dep. 30. Rains noted that on June 20, 2016, Plaintiff had sent an email stating, "Didn't get the alarm set on time last night. Head was swimming from my medication. I thought I set it. Checked it at 2:45am and it was not set. So I armed it then." Rains Dep, Ex. 4. Rains testified that although Plaintiff's failure to set the alarm "technically" violated Defendant's policy, he did not report Plaintiff because "we're all human," and "he explained the reason why he failed to do it." Rains Dep. 31.

### III. Plaintiff's Worker's Compensation Claim

Plaintiff testified that in late March 2016, he was stacking boxes of saw blades in the store's tool department when he "felt something go across my belly button." Pl. Dep. 212. At

first, Plaintiff "didn't think anything of it."  Pl. Dep. 212.  However, Plaintiff's physician

diagnosed an umbilical hernia.  Pl. Dep. 214-15.  Plaintiff reported the diagnosis to Schaffer in

April 2016, and Schaffer helped Plaintiff fill out a worker's compensation form.  Pl. Dep. 217.

Plaintiff notified Schaffer and human resources employee Tiffany Vance that he would need

surgery, which could require three to six weeks of leave to recover.  Pl. Dep. 232-33.  Plaintiff

did not remember Schaffer making any comment when Plaintiff said he would need surgery.  Pl.

Dep. 230.  Plaintiff testified, however, that he "could see the frustration in [Schaffer's] eyes.  It

wasn't . . . a professional interaction, but he was maintaining his composure, and we filled [the

worker's compensation claim form] out."  Pl. Dep. 32.  Plaintiff also testified that Schaffer said,

"You realize this is affecting our bottom line?"  Pl. Dep. 33.

Defendant did not discourage Plaintiff from seeking worker's compensation benefits.  Pl.

Dep. 228.  Defendant did not dispute Plaintiff's worker's compensation claim, which was

accepted by the insurer.  Pl. Dep. 224.  While awaiting surgery, Plaintiff was restricted to light

duty.  Pl. Dep. 224.  Defendant worked with Plaintiff's restrictions, leaving the issue to

Plaintiff's discretion.  Pl. Dep. 227.

Plaintiff worked with Vance and Schaffer on the best time to schedule the surgery.  He

underwent surgery on August 15, 2016.  Pl. Dep. 225.  Plaintiff took three weeks' leave, and

testified that he had "no problem" with how Defendant handled his leave.  Pl. Dep. 229.  When

Plaintiff returned to work after the surgery, he was initially restricted to light duty, which did not

cause problems.  Pl. Dep. 235.  Plaintiff returned to full duty by September 19, 2016.  Pl. Dep.

267.  Plaintiff's worker's compensation claim was closed on October 27, 2016.  Pl. Dep. 268.

Plaintiff testified that before he returned from surgery, his relationship with Schaffer was

"nothing out of the ordinary. Everything that our relationship was was a store manager and assistant manager. You know, there could be good things and bad things that come up based on the business, but [Schaffer] handled himself professionally before all that." Pl. Dep. 235. However, Plaintiff testified that after he returned from surgery, Schaffer began treating him differently. Pl. Dep. 234-25. While Schaffer had previously been "very professional" towards Plaintiff, Pl. Dep. 25, Plaintiff states that after he returned from surgery, Schaffer frequently ignored him and walked away while Plaintiff was talking to him. Pl. Dep. 204-05.

Defendant's employee Alicia Purdell-Hernandez also worked with Schaffer in the Delta Park store. She testified that Schaffer's behavior towards Plaintiff was typical of Schaffer's interactions with every employee, including her. Purdell-Hernandez Dep. 42, 44 (Schaffer acted that way towards "everyone"). Purdell-Hernandez testified that Schaffer "had a very short attention span. . . . . [T]here were times that I need to walk a department, and we'd get through a couple of aisles, and he would ask a customer, and, you know, go and help the customer, and never really come back." Purdell-Hernandez Dep. 41. Purdell-Hernandez also testified that Schaffer "always" displayed this short attention span in conversations, interrupting and "sometimes walk[ing] away while you were talking to him." Purdell-Hernandez testified that she saw Schaffer acted this way towards Plaintiff. For example, when Plaintiff would meet with Schaffer in the morning to summarize events of the previous night, Schaffer "would just walk away." Purdell-Hernandez Dep. 44.

Schaffer testified that he had never doubted the legitimacy of Plaintiff's worker's compensation claim. Schaffer Dep. 17. As to Plaintiff's allegation that Schaffer told him that his worker's compensation claim would affect the store's bottom line, Schaffer testified that

while any expense could have some impact on the bottom line, it would not be a "direct factor" in calculating Schaffer's bonus as store manager. Schaffer Dep. 32. There is no evidence in the record on the amount of Schaffer's bonus, or on the effect of worker's compensation claims on the bonus. As to Plaintiff's allegation that Schaffer refused to engage him in conversation, Schaffer testified he "would definitely not do it intentionally," although he may have done so inadvertently. Schaffer Dep. 33.

Rains, the store's loss prevention manager, did express doubts "to HR" about the validity of Plaintiff's worker's compensation claim. Rains Dep. 20. Rains based his doubts on his observation that before the injury, Plaintiff had appeared to use incorrect form when lifting boxes. Rains Dep. 49. Rains could not remember when he told the human resources managers, Tiffany Vance and Mary Walker, about his doubts, and he did not remember whether he ever told Schaffer. Rains Dep. 21. Rains testified that when he talked to Walker about Plaintiff's injury, she listened and looked serious, "rather somber actually." Rains Dep. 48. When Walker asked Rains if he had video showing Plaintiff's lifting technique, he told her that he did not find any. Rains Dep. 48. Rains testified that neither Schaffer nor Walker ever commented on whether they questioned Plaintiff's injury. Rains Dep. 47.

When Schaffer and Walker were considering whether to terminate Plaintiff because of the November 2, 2016 incident, Rains, as the security specialist, gave them factual background, including alarm records and video from the store's security cameras. However, as Plaintiff acknowledges, Rains "did not participate in the decision to terminate Plaintiff's employment." Pl. Mem. Opp'n 5. ECF No. 25. Rains testified that he was not aware that Defendant was considering terminating Plaintiff. Rains Dep. 21-22.

Plaintiff testified that in September 2016, he told Tiffany Vance, then human resources manager for the Delta Park store, about his "feelings on how I felt [Schaffer] was retaliating against me" because of the worker's compensation claim. Pl. Dep. 22, 29. This allegation, accepted as true for purposes of this motion, is not relevant to resolving Defendant's motion for summary judgment. Plaintiff testified that he when he told Vance about Schaffer's conduct, he asked Vance not to act on his complaint, and he rejected Vance's suggestion that he and Vance meet with Schaffer about the alleged retaliation. Pl. Dep. 29. Vance left for maternity leave shortly after her alleged September 2016 meeting with Plaintiff, and had no role in Plaintiff's subsequent termination. Pl. Dep. 60-61.

## IV. The November 2, 2016 Incident

On November 2, 2016, at about 2:30 a.m., Plaintiff was eating lunch when Zach Adams, a department manager, "came running in saying he saw somebody suspicious driving around the parking lot looking into cars." Pl. Dep. 122. Adams told Plaintiff that he saw the suspicious car near Plaintiff's vehicle, a Yukon Denali. Pl. Dep. 122, 138. Plaintiff and Adams attempted to observe the suspicious car through the store's front doors, but "couldn't get a good look at anything." Pl. Dep. 123. They then went to the store's loss prevention office, where they watched video footage showing "the car driving around in the parking lot." Pl. Dep. 123. Adams then told Plaintiff that he saw "something next to [Plaintiff's] vehicle, which looked like a person" standing next to the gas tank or at the rear of the vehicle. Pl. Dep. 123, 124.

In fact, the "suspicious" car was driven by the store's security guard, who was patrolling the parking lot. In a hand-written statement submitted to Defendant the next day, Plaintiff stated that after reviewing the security video of the parking lot, he was "embarrassed" when he realized

the figure standing next to his vehicle "was an illusion of the camera." Pl. Dep., Ex. 4, at 2, ECF No. 29-1, at 179.

Plaintiff testified that he and Adams went back to the front door, but were still not able to get a clear view. Pl. Dep. 128. Plaintiff testified that he then called 911, and described what he had seen. The operator "said she was dispatching an officer who was very close by, should be there within minutes." Pl. Dep. 128. Plaintiff testified that the operator "[t]hen asked me if I could safely open the door and get a better description of the vehicle and the individual to help the officer." Pl. Dep. 128. Plaintiff testified that he thought he could safely go outside, so he disarmed the alarm and stepped outside to get a better view, but the suspicious vehicle was too far away to see license plate number or describe the driver. Pl. Dep. 130. Plaintiff testified that he then told the 911 operator that he was going back inside the building to wait for the officer. Pl. Dep. 130, 131. Plaintiff testified that he went inside the store and relocked the doors.

At his second deposition for this action, Plaintiff listened to a recording of his 911 call for the first time after he had made the call. The 911 recording contradicts Plaintiff's prior deposition testimony that the 911 operator had told him to step out of the building if he could do so safely. Def.'s Mot. and Mem. Summ. J. 11, ECF No. 20. The 911 recording, transcribed (partially incorrectly according to Defendant) at Plaintiff's second deposition, indicates that Plaintiff initially told the operator, "I've got a car in my parking lot that's out breaking into vehicles." Pl. Dep. 315 (transcript of 911 call). As noted, the 911 recording indicates that the operator did not ask Plaintiff to step outside to get a description if he could do so safely. Instead, about a minute into the call, the operator asked Plaintiff where he was standing, and Plaintiff responded, "I'm standing right at front door, I just opened it up." Pl. Dep. 317. When asked at

the second deposition about the contradiction, Plaintiff testified that listening to the 911 recording caused him to question "why is what I recall different than what I'm hearing, I don't know." Pl. Dep. 321. In addition, alarm records and cell phone records indicate that Plaintiff disarmed the alarm at 2:33.29 a.m., and then dialed 911 four seconds later, instead of first calling 911 and then leaving the building. Def.'s Mot. 11. These minor discrepancies between the 911 recording and Plaintiff's memory are not material to the legal analysis.

Within a minute or two of the 911 call, a police officer in a patrol car "pulled up right out front of the doors." Pl. Dep. 132. Plaintiff unlocked the building's doors and walked to the police car to tell the officer "what was going on and what I'd seen." Pl. Dep. 134. While Plaintiff was talking to the officer, who remained in the car, the suspicious vehicle drove up, and Plaintiff realized the vehicle was the security guard's car. Pl. Dep. 135. Plaintiff testified that the car had "a primered door, which their car is normally black with a gold shield on the side of it." Pl. Dep. 135.

Plaintiff was not satisfied that the situation was resolved because he thought that the security guards were paid minimum wage and might not be "100 percent honest." Pl. Dep. 135. While the police officer was present, Plaintiff asked the security guard "why he was looking into the back of my vehicle, standing next to my vehicle." Pl. Dep. 135. The security guard told Plaintiff "that he was not looking in the back of my vehicle nor was he parked next to my vehicle." Pl. Dep. 136. Plaintiff told the officer that he did not "necessarily believe [the guard] that he wasn't standing next to [Plaintiff's] vehicle." Pl. Dep. 136. The officer then "leaned over" to the security guard and "told him that he was free to go." Pl. Dep. 136. The officer said "there's really not much here because it was a security patrol and . . . he was going to go ahead

and . . . take off." Pl. Dep. 136. Plaintiff testified that he though the officer "looked at this as being just a huge mix-up, and his concern level was dropped." Pl. Dep. 163. The officer then began driving out of the parking lot. Plaintiff did not ask the officer to wait in front of the store's unlocked front doors, or to accompany Plaintiff while he checked on his vehicle.

Plaintiff then walked to his vehicle "just to make sure nothing had happened" to it. Pl. Dep. 136-37. Plaintiff was in the parking lot for about two minutes. Pl. Dep. 164. Plaintiff told Adams, the department manager, and two other employees to "keep an eye on the door" while he checked on his vehicle. Pl. Dep. 137. Plaintiff did not lock the doors behind him, or tell Adams, who had a key, to lock them. The alarm remained disarmed. About eight employees, some wearing headphones, were working in the store, unaware that the alarm was off and the doors were unlocked. Pl. Dep. 142, 174. Plaintiff testified that he did not have enough time to notify these employees that he had disarmed the alarm. Pl. Dep. 174.

**V. Defendant's Investigation of the November 2, 2016 Incident**

Several hours later, Plaintiff told an opening manager and Rains about the incident. Pl. Dep. 169. Plaintiff did not send an email about the incident, as he had been told to do. *See* Pl. Dep. 169, 271.

Defendant's managers reviewed the video of the November 2 incident. Walker Dep. 42; Schaffer Dep. 40; Rains Dep. 40. Defendant also obtained the alarm report for November 2. Patronaggio Decl., Ex. 2. The alarm record indicated that Plaintiff had armed the alarm at 11:58 p.m. on November 1, 2016; disarmed the alarm at 2:23.29 a.m. on November 2, 2016; and re-armed the alarm at 2:52.14 a.m. *Id.*

Defendant asked Plaintiff for a written statement about the incident. Plaintiff submitted a

handwritten statement on November 3, 2016. Pl. Dep., Ex. 4.

After viewing the video, Walker sent an email to Schaffer, stating, "It appears [Plaintiff] went to his car and checked it out after the police pulled off and another associate walked up and outside." Walker Dep., Ex. 108. Walker asked Schaffer to obtain written statements from Adams and Joshua Tonga, who was one of the two employees Plaintiff asked to stand at the front doors during the November 2 incident. Walker Dep. 25 & Ex. 108.

In his November 3 statement, Adams wrote that he and Plaintiff "observed a suspicious vehicle in the Lowe's parking lot. After the vehicle stopped near employee vehicles [Plaintiff] called the police. At his request I joined him outside at the front of the building until the building was secure and the alarm armed." Walker Dep., Ex. 104. Tonga's statement, dated November 4, 2016, states, "I went to check out what was going on Wednesday night when I seen the front doors open and [Plaintiff] and Zack [Adams] was out there watching someone look into [Plaintiff's] car". Walker Dep., Ex. 3, at 24.

Schaffer testified that before viewing the evidence about the November 2 incident, he did not think Plaintiff's conduct had violated Defendant's policies. Schaffer Dep. 39. However, after viewing the video and consulting with Walker, the acting human resources manager, Schaffer concluded that Plaintiff's conduct had violated Defendant's policies on safety and security. Plaintiff "did not keep the building and the employees safe and secure where he left the building. He left the doors unlocked, and he left the building unarmed to go to the parking lot." Schaffer Dep. 41.

Walker concluded that Plaintiff's termination was justified "[b]ecause when he disarmed the building in November, he went out with the intention of confronting somebody that he

thought a crime was in progress, putting his entire crew at risk." Walker Dep. 20. At her deposition, Walker was asked whether a night store manager "might reasonably see the fact that someone appears to be breaking into their car as an emergency that justified bringing down the alarm under [Defendant's] policies?" Walker Dep. 27-28. Walker responded that such conduct would not be justified because "it's an inanimate object that puts the entire team at risk." Walker Dep. 28.

## VI. Plaintiff's Termination

Schaffer and Walker agreed that Plaintiff should be terminated. Melissa Toney, Defendant's area human resources manager, approved the termination for form.

On November 9, 2016, Schaffer asked Plaintiff to join him in his office. Pl. Dep. 193 & Ex. 9 (termination notice). Plaintiff testified that Schaffer apologized to him, stating "this is not personal, but [Defendant] is separating." Pl. Dep. 193. Plaintiff testified he was shocked that no one else was in Schaffer's office because it "left it to his word against mine." Pl. Dep. 193-94. Plaintiff testified Schaffer told him that Defendant was terminating him for putting employees in jeopardy. Pl. Dep. 194. Schaffer gave Plaintiff a Employee Corrective Action Report for his signature. The Report described Plaintiff's conduct as: "During the course of an investigation it was determined that you left the building unarmed at night to go into the parking lot to look at a suspicious vehicle. During the course of this action you requested an hourly employee to come with you." Pl. Dep., Ex. 9.

Plaintiff testified that during the meeting with Schaffer he became "very angry. My face was turning red. I couldn't believe this was happening." Pl. Dep. 194. Plaintiff testified that for the first time, he told Schaffer that he thought Schaffer was retaliating against him. Pl. Dep. 194.

Plaintiff refused to sign the termination form, instead writing, "Need HR follow-up."  Pl. Dep.

196 & Ex. 9.

Plaintiff's brief cites Walker's deposition testimony concerning Defendant's written

policies on security.  Pl. Mem. Opp'n 7-8.  Here is Walker's deposition testimony on

Defendant's written policy, including the portions omitted by Plaintiff's brief:

> Q:  So there was nothing in the policy that states that [Plaintiff] couldn't unarm or
> leave without an emergency?
>
> Ms. Totten [Defendant's attorney]:  Objection.  Calls for speculation.
>
> Q:  Answer the question.
>
> A:  So no, I could not find anything that said you can't leave to go check out your
> vehicle.
>
> Q:  Okay.  Couldn't find any policy that you said couldn't, correct?
>
> A:  Found policy that says they can't leave except for -- that they can't leave
> except for a medical or family emergency.
>
> Q:  Right.
>
> A:  Not even for breaks or lunches.

Walker Dep. 47.  As noted above, the written policy provides that employees may not leave the

store between midnight and 5:00 a.m. unless the employee has "an emergency (ex: family or

medical)."  Hunt Decl., Ex. 5, at 22.

Plaintiff also contends that Defendant requires progressive discipline.  However, Melissa

Toney, formerly Defendant's area human resources manager, explained that disciplinary

measures depend on the circumstances.  Toney Dep. 11, 20.  Toney testified that an employee

could be terminated "if he'd had no prior history of discipline" "if the act was egregious enough

to lead straight to termination."  Toney Dep. 20.  Toney testified that she found Plaintiff's

conduct "egregious" because he "took another employee out after dark, after the building was

closed, he unarmed the building and took another hourly employee out with him to check on his

car, putting him and everybody else in danger."  Toney Dep. 20.

## LEGAL STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The

moving party bears the initial responsibility of informing the court of the basis of its motion, and

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)

(quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial burden of demonstrating the absence of a genuine

issue of material fact, the burden then shifts to the nonmoving party to present "specific facts"

showing a "genuine issue for trial."  *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28

(9th Cir. 2009) (internal quotation marks omitted).  The nonmoving party must go beyond the

pleadings and designate facts showing an issue for trial.  *Bias v. Moynihan*, 508 F.3d 1212, 1218

(9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material.  *Suever v.

Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009).  The court draws inferences from the facts in the

light most favorable to the nonmoving party.  *Earl v. Nielsen Media Research, Inc.*, 658 F.3d

1108, 1112 (9th Cir. 2011).  If the factual context makes the nonmoving party's claim on the

existence of a material issue of fact implausible, that party must come forward with more

persuasive evidence to support his claim than would otherwise be necessary.  *Matsushita Elec.*

*Indus. Co. v.. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).


**DISCUSSION**

**I.  Claim for Worker's Compensation Retaliation**

    **A.  Prima Facie Case**

    Oregon Revised Statute § 659A.040 provides:

> It is an unlawful employment practice for an employer to discriminate against a worker with respect to hire or tenure or any term or condition of employment because the worker has applied for benefits or invoked or utilized the procedures provided for in ORS chapter 656 or has given testimony under the provisions of those laws.

To establish a prima facie case for violation of § 659A.040, a plaintiff must prove: (1) the plaintiff invoked the workers' compensation system; (2) the defendant discriminated or retaliated against the plaintiff in hiring or tenure, terms, or conditions of employment; and (3) the defendant discriminated or retaliated against the plaintiff because the plaintiff invoked the workers' compensation system.  *Davis v. Tri-County Metro. Transp. Dist. of Oregon*, 45 F. Supp. 3d 1222, 1238 (D. Or. 2014); *see also Williams v. Freightliner, LLC*, 196 Or. App. 83, 90, 100 P.3d 1117, 1121 (2004).  Here, the parties dispute only causation, the third element of a prima facie case.

    This Court applies the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to determine whether Plaintiff has carried his burden on causation. *See Anderson v. Hibu, Inc.*, 26 F. Supp. 3d 1019, 1025 (D. Or. 2014).  Although Oregon has rejected the *McDonnell Douglas* analysis for claims under § 659A.040 in state court, *see*

*Williams*, 196 Or. Appl at 89, 100 P.3d at 1121, this court applies the *McDonnell Douglas* analysis because it is federal procedural law. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1090-93 (9th Cir. 2001); *Strickland v. RM Mech., Inc.*, No. 3:16-cv-00965-MO, 2017 WL 3749762, at *9 (D. Or. Aug. 30, 2017).

To satisfy his initial burden on causation, Plaintiff must make a prima facie showing that his "invocation of the workers' compensation system was a substantial factor" in Defendant's decision to undertake the adverse employment action. *Herbert v. Altimeter, Inc.*, 230 Or. App. 715, 726, 218 P.3d 542, 548 (2009). "[T]o be a substantial factor, the employer's wrongful purpose must have been 'a factor that made a difference in the adverse employment action." *Estes v. Lewis and Clark Coll.*, 152 Or. App. 372, 381, 954 P.2d 792, 797 (1998) (quotation marks and citation omitted). "The degree of proof necessary to establish a prima facie case of a causal link on summary judgment is 'minimal' and a plaintiff need only prove an inference of discrimination." *Davis*, 45 F. Supp. 3d at 1241.

Here, I conclude that Plaintiff has not shown a prima facie case of causation because there is insufficient evidence that Defendant terminated him for invoking the worker's compensation system. Plaintiff cites Schaffer's alleged comment to him that his worker's compensation claim would affect Defendant's bottom line, but there is no evidence that such claims would reduce any bonus due to Schaffer as store manager. As Defendant points out, if an employer terminates an employee after the employee has sought worker's compensation benefits, the employer would still be responsible for the cost of the employee's claim after termination. Def.'s Reply 13 (citing Or. Rev. Stat. § 656.308(1)). There is no evidence that any hypothetical effect on Defendant's bottom line changed Defendant's treatment of Plaintiff. Nor

has Plaintiff presented evidence that Schaffer, Walker, or Toney considered the worker's compensation claim as a factor in their decision to terminate him.

Rains, the loss prevention manager, doubted the validity of Plaintiff's worker's compensation claim, based on his observation that Plaintiff had been using incorrect lifting techniques. However, it is undisputed that Rains had no say in the decision to terminate Plaintiff, and he did not even know that Defendant was considering termination. Furthermore, Rains questioned the validity of Plaintiff's worker's compensation claim, but did not cite the expense to Defendant.

Plaintiff notes that his worker's compensation claim officially closed October 27, 2016, a little more than a week before he was terminated on November 9, 2016. For purposes of this motion, I assume that temporal proximity between an employee's protected conduct and the adverse employment act, by itself, may be sufficient to show retaliation.[2]

Here, Plaintiff does not dispute that Defendant treated him correctly throughout the worker's compensation process until his return to work after surgery. As Defendant notes, if Defendant had needed an excuse to terminate Plaintiff for invoking the worker's compensation system, Defendant could have cited Plaintiff's multiple decisions to disarm the store alarm during the summer of 2016, in particular the night Plaintiff forgot to arm the alarm for several hours because of the medication he was taking.

---

[2] Judge McShane has noted, "In this district, there is some disagreement as to whether temporal proximity *alone* is sufficient to support an inference of retaliatory motive under ORS § 659A.043(1)." *Alvarez v. Ecolab Inc.*, No. 6:13-cv-01718-MC, 2014 WL 6684910, at *6 (D. Or. Nov. 25,2014) (comparing *Duke v. F.M.K. Constr. Servs., Inc.*, 739 F. Supp. 2d 1296, 1302 (D. Or. 2010) (temporal proximity alone did not create a genuine factual issue of discrimination) with *Looney v. Wash. Cnty., Or.*, No. 09-cv-1139-HA, 2011 WL 2712982 at *6 (D. Or. July 13, 2011) (the plaintiff showed causation by referring to "the proximity between plaintiff's application for workers' compensation benefits . . . and his termination")).

Plaintiff contends that after he returned to work, Schaffer retaliated by ignoring him and by walking away when he was trying to talk to Schaffer. However, the evidence indicates that rather than singling Plaintiff out for retaliation, Schaffer treated all employees this way. More importantly, as Defendant argues, Plaintiff's conduct on November 2, 2016 is an intervening event that supports Defendant's decision to terminate Plaintiff. *See, e.g.*, *Curley v. City of N. Las Vegas*, 772 F.3d 629, 634 (9th Cir. 2014) ("new information revealed by [an intervening] investigation defeats any causal inference that might otherwise follow from the temporal proximity between . . . protected activity and . . . termination."). Although a plaintiff's burden to prove a prima facie case is light, I conclude that here, Plaintiff has not carried his burden.

### B. Legitimate Non-Retaliatory Reason

Even if Plaintiff could make a prima facie case of retaliation, his claim still fails. Under the *McDonnell Douglas* framework, "after a plaintiff proves a prima facie case of retaliation, the employer must present evidence of a legitimate, non-retaliatory reason for the adverse action." *Davis*, 45 F. Supp. 3d at 1238. "If defendant meets this burden, then the burden returns to plaintiff to show by a preponderance of the evidence that the alleged legitimate, nondiscriminatory reason for the adverse employment action is merely a pretext for discrimination." *Anderson*, 26 F. Supp. 3d at 1025; *Strickland v. RM Mech., Inc.*, No. 3:16-cv-00965-MO, 2017 WL 3749762, at *10 (D. Or. Aug. 30, 2017).

Here, Defendant has shown a legitimate nondiscriminatory reason for terminating Plaintiff, that is, Plaintiff's decision to disarm the alarm and to leave the store with the doors unlocked to check on his personal vehicle. Plaintiff has not shown that Defendant's stated reason for terminating him was a pretext for retaliating against him for seeking worker's

compensation benefits.  Defendant is entitled to summary judgment on this claim.


## II.  Claim for Retaliation Because of Reporting a Crime

Plaintiff claims that Defendant terminated him in retaliation for reporting a crime.  As relevant here, Or. Rev. Stat. § 659A.230 prohibits employers from discharging an employee "for the reason that the employee has in good faith reported criminal activity by any person [or] has in good faith cooperated with any law enforcement agency conducting a criminal investigation." Or. Rev. Stat. § 659A.230(1).  "To survive summary judgment on a whistleblower claim under . . . §659A.230, a plaintiff must identify 'the existence of facts from which a reasonable fact finder could conclude . . . she engaged in protected activity . . . [and] defendant[ ] retaliated against her in response to that activity. . . .  [I]f the employer asserts a non-discriminatory reason for the employee's termination, the plaintiff must show that the employer would not have made the same decision absent a discriminatory motive.'" *Larmanger v. Kaiser Found. Health Plan of the Northwest*, 895 F. Supp. 2d 1033, 1049 (D. Or. 2012) (quoting *Merrill v. M.I.T.C.H. Charter Sch. Tigard*, No. 10-cv-219-HA, 2011 WL 1457461, at *7 (D. Or. Apr. 4, 2011) (brackets and ellipses added by *Larmanger*; citations omitted)).

To establish causation, the plaintiff must show the protected activity was a "'substantial factor in the motivation to discharge the employee.'" *Sandberg v. City of N. Plains*, No. 10-cv-1273-HZ, 2012 WL 602434, at *7 (D. Or.  Feb. 22, 2012) (quoting *Estes*, 152 Or. App. at 381, 954 P.2d at 797).  "[T]o be a substantial factor, the employer's wrongful purpose must have been a factor that made a difference in the discharge decision." *Estes*, 152 Or. App. at 381, 954 P.2d at 797 (quotation marks and citation omitted).

Plaintiff concedes that the evidence on this claim "is not as abundant" as the evidence on his other claim.  Pl. Mem. Opp'n 17.  At their depositions, Schaffer, Walker, and Toney distinguished Plaintiff's conduct in disarming the alarm to talk to the police officer, which did not violate Defendant's policy, from his conduct in leaving the store unlocked and disarmed to check on a personal vehicle, while the police officer was no longer present.  Plaintiff has not presented evidence from which a jury could conclude that Defendant terminated him in retaliation for cooperating with the police.  For example, there is no evidence that Plaintiff was following the police officer's instructions when he left the store alarm unarmed while he checked on his vehicle.  Plaintiff could have asked to officer to accompany him to his vehicle, or to stay in the parking lot while Plaintiff walked to his vehicle.  I conclude that Defendant is also entitled to summary judgment on Plaintiff's claim under Or. Rev. Stat. § 659A.230.

## CONCLUSION

Defendant's Motion for Summary Judgment, ECF No. 20, is GRANTED.

IT IS SO ORDERED.

DATED this 4 day of January, 2019.

MARCO A. HERNANDEZ
United States District Judge